UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re<br><br>FISHING VESSEL OWNERS MARINE WAYS, INC.,<br><br>                Debtor. | Lead Case No. 19-13502<br><br>(Jointly Administered with<br>Case No. 19-13504) |
| In re<br><br>SEATTLE MACHINE WORKS<br><br>                Debtor. | DEBTORS' JOINT DISCLOSURE STATEMENT |

IMPORTANT: THIS DISCLOSURE STATEMENT CONTAINS INFORMATION RELATED TO THE DEBTORS' PROPOSED PLAN OF REORGANIZATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT IT. PLEASE READ THIS DOCUMENT WITH CARE.

THIS DOCUMENT SUMMARIZES THE TERMS OF THE PLAN. THE INFORMATION CONTAINED HEREIN IS FOR PURPOSES OF SOLICITING ACCEPTANCE OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE. THE DEBTORS MAY CONTINUE TO NEGOTIATE PAYMENT TERMS WITH THEIR CREDITORS, AND THE SPECIFIC TREATMENT OF CLAIMS MAY CHANGE AS A RESULT. HOWEVER, THE PAYMENT TERMS WHICH THE DEBTORS WILL ASK THE COURT TO APPROVE WILL IN NO CASE BE MATERIALLY LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

TO ALL PARTIES IN INTEREST:

On September 23, 2019 (the "Petition Date"), Fishing Vessel Owners Marine Ways, Inc. ("FVO"), and Seattle Machine Works, Inc. ("SMW" and with FVO, the "Debtors"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

This Disclosure Statement contains information with respect to the Debtors' proposed Plan. Pursuant to § 1125 of the Bankruptcy Code, the Disclosure Statement is being distributed to you along with a copy of the Plan to allow you to make an informed decision in exercising your right to accept or reject the Plan. This Disclosure Statement has been approved by order of the Court pursuant to § 1125 of the Bankruptcy Code as containing information of a kind, and in sufficient detail, as far as is reasonably practicable under the circumstances, that would enable a hypothetical reasonable investor to make an informed judgment about the Plan. In the event of inconsistencies between the Plan and the Disclosure Statement, however, the terms of the Plan shall control. The Court's approval of this Disclosure Statement does not constitute an endorsement of the Plan by the Court.

The Debtors recommend that you accept the proposed Plan and urges you to promptly return your completed ballot to enable your vote to be counted.

## I. DEFINITIONS

Terms used in this Disclosure Statement not specifically defined herein or in the Bankruptcy Code shall be defined as set forth in the Plan that accompanies this Disclosure Statement. In particular, capitalized terms shall have the meanings identified in Section II of the Plan.

## II. BACKGROUND INFORMATION

A. **Historical Background and Events Leading to Bankruptcy**

1. **The Debtors and their Operations.**

The Debtors commenced their chapter 11 cases on Petition Date. The Debtors continue to operate their businesses and manage their affairs as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

FVO is a full-service shipyard and machine shop located in the heart of Ballard's Fishermen's Terminal. FVO was founded in 1919 when members of the Fishing Vessel Owners Association formed their own company to address the shortage of ship repair facilities in the Puget Sound area. FVO continues to be privately-owned, with 54 individual shareholders holding a total of about 1,750 corporate shares, and has been servicing the Pacific Northwest marine industry for 100 years.

FVO specializes in working with steel and wood fishing vessels, tug boats, house boats, cruise boats and yachts, providing services including haul outs, painting, sandblasting, welding, machining

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

and woodworking.  FVO also performs marine surveys.  FVO operates on facilities it has leased from the Port of Seattle since the Company's inception.

FVO's haul-out capabilities are by way of two "marine ways," which gives the Debtor its name.  A marine way is a pair of tracks, like train tracks, that run from below the waterline up onto the shore.  A boat can be floated into a cradle that runs along the tracks.  An onshore winch is used to pull the cradle out of the water to make the vessel's hull accessible for repairs and maintenance.

SMW is wholly-owned by FVO, and provides FVO and its customers with machining services and related repair work.  SMW's operations are fully integrated with FVO's services.

The Debtors' operations tend to be seasonal.  Operations usually begin to ramp up in September and carry through the spring of the following year.  At its seasonal peak, the Debtors employ some 32 workers.  During the months of May through August, the Debtors' operations and workforce generally decline.

### 2. Line of Credit.

In 2011, the Debtors entered into a revolving line of credit financing arrangement (the "Line of Credit") with Mountain Pacific Bank (the "Bank").  The Line of Credit is evidenced by, among other documents, (i) a Promissory Note (the "Note"), dated April 20, 2011, in the original principal amount of $500,000; (ii) a Commercial Security Agreement, dated April 20, 2011, by which the Debtor granted the Bank a security interest in its inventory, chattel paper, accounts, equipment and general intangibles (the "Prepetition Collateral"); and (iii) a UCC Financing Statement, recorded under File No. 2011-112-9916-5, perfecting the Bank's interests in the Prepetition Collateral.  The Line of Credit has been modified from time to time since its inception.  By way of a Change in Terms Agreement, dated July 2, 2019, the maturity date of the Note was extended to July 20, 2020.  As of the Petition Date, the outstanding balance of the Line of Credit was approximately $200,000.

### 3. The Debtors' Collective Bargaining Agreements.

As detailed below, debtor FVO is a party to two collective bargaining agreements, and debtor SMW is a party to one collective bargaining agreement (each a "CBA" and collectively, the "CBAs").  Each CBA requires FVO and SMW to participate in one or more multi-employer defined benefit pension plans.

FVO:  FVO is a party to a CBA with the Pacific Northwest Regional Council of Carpenters, Local 1184 (the "Carpenters Union CBA").  The other CBA is with the Puget Sound Metal Trades Council (the "Metal Trades CBA"), which covers three local bargaining units: the International Brotherhood of Boilermakers, Local 104; the Laborers Union, Local 252; and the International Association of Machinists and Aerospace Workers, Local 160.  Both the Carpenters Union CBA and the Metal Trades CBA are dated July 1, 2018, and are effective through July 1, 2021.

FVO is required under the Carpenters Union CBA to participate in the Marine Carpenters Pension Fund (the "Carpenters Pension").  FVO is required under the Metal Trades CBA

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

to participate in two multi-employer defined benefit pension plans: the Boilermakers-Blacksmith National Pension Trust (the "Boilermakers Pension"); and the Western Metal Industry Pension Fund (the "Metal Industry Pension").[1]

SMW:  SMW is a party to a collective bargaining agreement with the International Association of Machinists and Aerospace Workers, Local 79 (the "Machinists CBA").  Pursuant to the terms of the Machinists CBA, SMW also participates in the Metal Industry Pension.

**4.      Each Pension Plan is Underfunded and in "Critical" Status.**

Carpenters Pension.  The Carpenters Pension has self-certified as being in "critical status" for purposes of applicable federal law each year since 2010.  Because it is in critical status, the Carpenters Pension was required to create and implement a "rehabilitation plan" that is intended to allow the plan to emerge from critical status over time.  As a component of its rehabilitation plans, FVO's employees that are covered under the Marine Carpenters CBA must pay a surcharge, out of their own wages, of $9.00 per hour.

Metal Industry Pension. The Metal Industry Pension has also self-certified as being in "critical status" each year since 2010.  As a result, the Metal Industry Pension also implemented a "rehabilitation plan" to address its underfunding.  As one of its components, FVO's employees that are participants under the Metal Industry Pension must pay a surcharge, out of their own wages, of $4.48 per hour.

Boilermakers Pension. For the plan year commencing January 1, 2019, the Boilermakers Pension also entered "critical" status.  The Boilermakers Pension also adopted a rehabilitation plan, which includes a surcharge that covered employees must pay, out of their wages, of $6.09 per hour.[2]

**5.      Withdrawal Liability Demand.**

Prior to the Petition Date, debtor FVO received a demand letter from the Carpenters Pension, alleging that FVO had partially withdrawn from the Carpenters Pension and making demand for payment of $1,243,757.  "Partial withdrawal" from a pension plan occurs where (generally) there is 70% decline in an employer's contributions to the pension plan on behalf of covered employees. *See* 29 U.S.C. § 1385(a), (b).

In this case, withdrawal liability was triggered not by some massive layoff or cessation of business activities.  Rather, FVO's "partial withdrawal" allegedly occurred when FVO's employment

---

[1] FVO also contributes to the Northwest Employees Retirement Plan, a defined contribution (401k) plan, for the benefit of the Laborers Union, Local 252.

[2] The surcharges imposed on employees under the rehabilitation plans that the Carpenters Pension, the Metal Industry Pension and the Boilermakers Pension have adopted are collectively referred to as the "Rehabilitation Surcharges".

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

of members of the Carpenters Union went from five employees to one. Put another way, there would be no withdrawal liability if FVO still employed at least two marine carpenters. The reduction from two to one marine carpenters triggered the demand for more than $1.2 million.

The Debtor therefore made the difficult decision to commence this chapter 11 case, to preserve its operations and allow it an opportunity to both address the existing withdrawal liability and to negotiate modifications to the CBAs with its collective bargaining units that allow the Debtor to maintain its operations into the future.

**B.     Events since the Petition Date.**

**1.     Joint Administration.** On September 24, 2019, the Court entered an order directing joint administration of the Debtors' cases. Dkt. No. 6.

**2.     Orders on First Day Motions.** On September 26, 2019, the Court entered an order authorizing its payment of prepetition payroll, employee benefits, and related expenses. Dkt. No. 15. On September 27, 2019, the Court entered orders approving the Debtors' proposed adequate protection to utility providers, and authorizing Debtors' continued usage of its existing cash management system and prepetition business banking accounts and checks. Dkt. Nos. 24, 25.

**3.     US Premium Finance.** In the ordinary course of the Debtors' businesses, the Debtors maintain various insurance policies, which are financed through US Premium Finance ("USPF") and memorialized in a Premium Finance Agreement and Disclosure Statement ("Financing Agreement"). Dkt. Nos. 27, 28. The Debtors' prepetition policies were set to expire on October 1, 2019. The renewal policies, as set forth in the Financing Agreement, bear a total premium cost of $90,295.00. Id. By orders entered on September 27 and October 16, 2019, the Court authorized the Debtors to enter into the Financing Agreement, which includes a security agreement that grants USPF a secured interest in the policies and all rights therein including all dividends, payments on claims, unearned premiums and unearned commissions. Dkt. Nos. 33, 56. In the event that the Debtors default upon any of the terms of the Financing Agreement, USPF may exercise its state law rights, up to and including cancelling the policies and applying all unearned insurance premiums to the Debtors' account. Dkt. No. 56.

**4.     Approval of Cash Collateral Usage.** The Debtors require the continued use of cash proceeds from the collection of customer contracts and accounts receivable ("Cash Collateral") to fund payroll and related payroll expenses and other fundamental operating expenses, and to otherwise minimize disruption to and avoid termination of its operations, and thereby avoid immediate and irreparable harm to their businesses. By orders entered September 27 and October 31, 2019, the Court authorized the Debtors' ongoing use of Cash Collateral through the earlier of (i) the effective date of a confirmed plan of reorganization, or (ii) entry of a subsequent order of the Court terminating the Debtors' authority to use Cash Collateral. Dkt. Nos. 26, 82. In addition, the final Cash Collateral order granted adequate protection in favor of Mountain Pacific Bank (the "Bank") in the form of, among other things, replacement liens in post-petition collateral to the extent of diminution in value, and monthly interest payments to the Bank in the amount of $1,100, varying on a monthly basis depending upon the then-existing balance of the line of credit.

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

**5. Approval of Mountain Pacific Bank DIP Facility.** In 2011, the Debtors entered into a revolving line of credit financing arrangement (the "Line of Credit") with Mountain Pacific Bank (the "Bank"). The Line of Credit is evidenced by, among other documents, (i) a Promissory Note (the "Note"), dated April 20, 2011, in the original principal amount of $500,000 under which both FVO and SMW are makers; (ii) a Commercial Security Agreement, dated April 20, 2011, by which the Debtors granted the Bank a security interest in their inventory, chattel paper, accounts, equipment and general intangibles (the "Prepetition Collateral"); and (iii) a UCC-1 Financing Statement, recording no. 2011-112-9916-5, perfecting the Bank's interests in the Prepetition Collateral. The Line of Credit has been modified from time to time since its inception. By way of a Change in Terms Agreement, dated July 2, 2019, the maturity date of the Note was extended to July 20, 2020. Dkt. Nos. 58, 59. Upon filing, the Bank put a temporary freeze on the Line of Credit to give it an opportunity to review and understand the current circumstances of the Debtors.

On October 17, 2019, the Debtors filed their *Motion for Order Granting Interim Approval of Postpetition Secured Lending Facility*, requesting the Court approve, on an interim basis, the above terms of the DIP Facility with the Bank. Dkt. No. 58. On October 25, 2019, the Court granted interim approval of the DIP Facility and Carveout, and set a final hearing for November 21, 2019. See Dkt. No. 76. No objections or other responses were filed as to final approval of the DIP Facility. On November 19, 2019, the Court entered its *Order Granting Final Approval of Postpetition Secured Lending Facility and Carveout*. Dkt No. 86. As of the date of this Disclosure Statement, the outstanding balance of the Line of Credit was approximately $355,000.

**6. No Appointment of Committee.** On November 6, 2019, the United States Trustee filed a notice that, despite efforts to contact eligible unsecured creditors, the United State Trustee had not received a sufficient number of creditors willing to serve on a committee, and accordingly, the United States Trustee is unable to appoint a committee pursuant to 11 U.S.C. § 1102(a).

**7. Employment of Professionals.**

| Professional | Representing | Role | Approval Date | Docket No. |
|---|---|---|---|---|
| Bush Kornfeld LLP | Debtors FVO & SMW | Bankruptcy Counsel | 10/24/2019 | 75 |

**8. Proposals to Unions.** On November 27, 2019, the Debtors sent proposals to each of the Unions for modification of the CBAs pursuant to 11 U.S.C. § 1113(b)(1)(A). To date, the Debtors have received no response from any of the Unions to those proposals.

**9. Orders Extending Deadline to Assume Leases.** On December 18, 2019, Debtor FVO filed its *Motion to Extend Deadline to Assume or Reject Non-Residential Real Property Lease*, relating to FVO's lease of its business premises from the Port of Seattle. Dkt. No. 87. No objections or other responses were filed to the motion. On January 10, 2020, the Court entered its *Order Extending Deadline to Assume Non-Residential Real Property Lease*, which extended the deadline to assume the lease to April 20, 2020. Dkt. No. 94.

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 6

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

**10.     Motion to Reject CBAs.**  On February 12, 2020, the Debtors filed their *Motion for Order Authorizing Rejection of Collective Bargaining Agreements.*  Dkt No. 98.  A hearing on the motion is set for February 26, 2020.

### III.  ASSETS AND LIABILITIES

**A.     Assets**

The Debtor's Schedules reflect the following assets as of the Petition Date:

| Asset | Scheduled Value as of Petition Date |
|---|---|
| Funds in various accounts | $121,311.86 |
| Customer prepayments | $411,056.08 |
| Accounts receivable | $253,954.03 |
| Raw materials and miscellaneous inventory | $57,253.03 |
| Office furniture and equipment (book value) | $115,905.00 |
| Vehicles | $2,250.00 |
| Production machinery and equipment | $219,200.00 |
| **TOTAL** | **$1,238,197.03** |

**B.     Liabilities**

**1.     Secured Claim.**  The only Secured Claim is the Line of Credit with the Bank, as detailed above.

**2.     Priority Unsecured Claims.**  According to the Schedules and Proofs of Claim that have been filed in this Bankruptcy Case, there are the following Priority Claims in these cases:

| Creditor | Type of Claim | Amount |
|---|---|---|
| Internal Revenue Service | Taxes | $53,448.08 |
| King County Treasury | Ad valorem taxes | $3,764.59 |
| **Total:** | | **$57,212.67** |

The IRS' proof of claim stated estimated amounts.  According to the Debtors' record, all amounts have been paid.

**3.     General Unsecured Claims.**

According to the Debtors' Schedules, Unsecured Claims total approximately $270,000.  This amount does not include amounts that may be owing to the Pension Funds, which amounts the Debtors anticipate will be substantial.  The deadline for filing Proofs of Claim was either (i) November 26, 2019, for non-governmental Creditors, or (ii) December 27, 2019, for each Creditor that is a "governmental unit" for purposes of § 101(27) of the Bankruptcy Code.

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 7

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

# IV. SUMMARY OF PROPOSED PLAN OF REORGANIZATION

A complete copy of the proposed Plan accompanies this Disclosure Statement. The discussion of the Plan that follows constitutes a summary only. You are urged to read the Plan itself with care before deciding to accept or reject the Plan.

## A. Explanation of Impaired and Unimpaired Claims

As set forth below, the Plan establishes various Classes of Claims and Equity Interests. Pursuant to Bankruptcy Code § 1126(f), only Classes of Claims that are "impaired" are entitled to vote to accept or reject the Plan, as a Class of Creditors that is not impaired is conclusively presumed to have accepted the Plan. Generally, a Class of Claims or Interests is unimpaired if the Plan does not in any way alter the rights and privileges that the creditors or equity holder would otherwise have. Each Class is impaired under the Plan, and the holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

## B. Classification of Claims and Interests

The Plan establishes four Classes of claims and two Classes of Equity Interests. If the Plan is confirmed by the Court and becomes effective, the class into which each Allowed Claim and Allowed Interest fits will determine the manner in which such claim or interest will be treated. The classes defined in the proposed Plan are summarized below.

### 1. Unclassified Claims

#### a. Administrative Claims

As defined under the Plan, Administrative Expense Claims are Allowed Claims for costs or expenses of the Reorganization Case that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code, which will primarily be comprised of the allowed claims of Professional Persons and amounts owed the United States Trustee pursuant to 28 U.S.C. § 1930. Claims incurred in the ordinary course of the business following the date of the Debtors' bankruptcy filings shall be paid in the ordinary course of business in accordance with the terms and conditions of the particular agreements governing such obligations, and shall not otherwise be treated under the Plan.

#### b. Priority Tax Claims

As defined under the Plan, Priority Tax Claims are Allowed Claims of Taxing Agencies that are entitled to priority in accordance with section 507(a)(8) of the Bankruptcy Code. Priority Tax Claims include the principal portion of the applicable tax and interest accrued thereon through the Effective Date but do not include any penalties. Claims of taxing agencies for penalties shall be Class 3 Claims to the extent they are Allowed Claims and shall not be treated as a Priority Tax Claim.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

**2.** **Classified Claims and Interests**

The Plan establishes four Classes of Claims and two Classes of Equity Interests:

Class 1: Secured Claim of Mountain Pacific Bank
Class 2: Unsecured Claim of Port of Seattle
Class 3: Unsecured Claims of Pension Funds
Class 4: Administrative Convenience Claims
Class 5: Unsecured Claims Other Than Class 2 Claims
Class 6: Equity Interests in FVO
Class 7: Equity Interests in SMW

**C.** **Treatment of Claims and Interests Under the Plan**

1. Unclassified Claims.

a. Administrative Expense Claims. As defined in the Plan, Administrative Expense Claims are Allowed Claims for costs or expenses of the Reorganization Case that are allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code. Claims incurred in the ordinary course of the Debtor's business following the Petition Date shall be paid in the ordinary course of business in accordance with the terms and conditions of the particular agreements governing such obligations. Claims of Professional Persons shall be paid on the later of the Effective Date or the date each such Claim becomes an Allowed Claim.

b. Priority Tax Claims. Each Priority Tax Claim shall be paid in full in equal monthly payments commencing in the first full month following the Effective Date based upon an amortization equal to sixty (60) months less the number of full calendar months between the Petition Date and the Effective Date. (By way of example only, if the Effective Date occurs in January 2020, the amortization would be over a period of 56 months.) Simple interest shall accrue on each Priority Tax Claim at the Federal Judgment Rate until paid in full.

2. Classified Claims and Interests.

The Treatment of Claims and Interests Under the Plan, and the Means for Execution of the Plan, are set forth in Sections IV and V, respectively, of the Plan and are summarized below. Notwithstanding the summary provided below, the terms of the Plan shall control the classification and treatment of claims and all other aspects of the Reorganized Debtor's rights and obligations as to matters governed by the Plan following the Effective Date. Parties are urged to read the Plan with care to determine the treatment proposed for their Claim or Interest.

In summary, the Plan treats the various classes as follows:

Class 1: Mountain Pacific Bank. The Class 1 Claim shall be allowed in the amount outstanding on the DIP Facility as of the Effective Date. The Bank shall retain all its security interests in and liens on the collateral securing its claim following the Effective Date. The Debtors shall

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 9

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

continue to utilize the Line of Credit following Confirmation in the same manner as prior to Confirmation. The Plan provides that the Debtors shall continue to make interest-only monthly payments, managing the line with principal payments and draws in the ordinary course of business. The Line of Credit shall mature in July 2020 but shall automatically renew so long as the Debtors are not then in default.

Class 2: Port of Seattle: The Port's claim in the amount of $4,667.06 is the cure that will be owing in connection with FVO's assumption of the Port Lease. FVO shall make three equal payments to the Port of Seattle of $1,575.00 each, commencing in the first full month following the Effective Date, in full satisfaction of the Class 2 Claim.

Class 3: Unsecured Claims of the Pension Funds. The Class 3 Claims consist of each and every Claim against the Debtors, or either of them, in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, contract, agreement, event, or any other occurrence taking place at any time prior to or as of the Effective Date, arising from, in connection with, or relating to the Pension Funds, or any of them. The Class 3 Claims shall each be allowed in such amount as the Debtors and the Pension Funds may agree or the Court allows following Notice and Hearing. Each holder of a Class 3 Claim that is an Allowed Claims shall receive its Pro Rata share of monthly payments totaling $2,000 each, commencing in the first full month after Confirmation and continuing through the thirty-sixth (36th) month following Confirmation.

Class 4: Administrative Convenience Claims. As detailed in the Plan, Administrative Convenience Claims generally consist of all Unsecured Claims in the amount of $600 or less. The Debtor's Schedules indicate that the Claims that would qualify for treatment under Class 4 total approximately $4,327.10. Each Class 4 Claim shall be allowed or disallowed, as the case may be, whether prior to or following Confirmation, in such amount as to which the Debtor may agree or the Court may approve following Notice and Hearing. The Debtors shall pay each holder of a Class 4 Claim a Cash payment equal to the full amount of such holder's Allowed Claim on the later of (i) ten (10) Business Days after the Effective Date, or (ii) three (3) Business Days following the date upon which the Debtors receives notice that such Claim has become an Allowed Claim. The Plan also contains provisions that address the event that the total of all Class 4 claims exceeds the expected total set forth above.

Class 5: Unsecured Claims Other Than Claims in Classes 2, 3 and 4. Class 5 consists of all Unsecured Claim other than Allowed Claims that qualify for or elect treatment under Classes 2, 3 and 4 (the "Class 5 Claims"). Each Class 5 Claim shall be allowed or disallowed, as the case may be, whether prior to or following Confirmation, in such amount as to which the Debtors may agree or the Court may approve following Notice and Hearing. Each holder of a Class 5 Claim shall be paid in full in forty-eight (48) equal monthly payments, commencing in the first full month following the Effective Date. All payments shall be made on or before the tenth (10th) day of each month in which a payment is due. Simple interest shall accrue on the unpaid balance of each Class 5 Claim at the Federal Judgment Rate (as defined in the Plan).

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 10

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

Class 6:  Equity Interests in SMW.  Class 6 consists of Equity Interests in debtor SMW, all of which is held by debtor FVO.  FVO shall retain its interests in SMW following Confirmation, but shall receive no distributions on account of such interests.

Class 7:  Equity Interests in FVO.  Class 7 consists of Equity Interests in debtor FVO. The holders of the Equity Interests in FVO shall retain their interests in FVO following Confirmation, but shall receive no distributions on account of such interests.

## V.  TAX CONSEQUENCES

The Debtors cannot specify the federal income tax consequences of the implementation of the Plan as to any Creditor, as it will be dependent on a number of factors that will be different in the case of each Creditor and as to which the Debtors have no information.  These factors include, but are not limited to (a) whether the Claim constitutes a debt or security for federal income tax purposes, (b) whether the Creditor receives consideration on account of its Claim in more than one tax year, (c) whether the Creditor is a resident of the United States, (d) whether the Creditor would be deemed to have received payment on its Claim as part of an integrated transaction, (e) whether the Creditor reports income using the accrual or cash method of accounting, and (f) whether the Creditor has previously taken a bad debt deduction or worthless security deduction with respect to the Claim.  The Debtors therefore disclaim any obligation to specify the tax treatment of any distributions made to any Creditor.

The Debtors anticipate that the tax consequences of the Plan to the Debtor will have no effect on its ability to consummate the Plan.  The primary tax event arises in connection with the cancellation of indebtedness under the Plan, which is generally the amount of debt discharged less the amount paid to creditors under the Plan.  This cancellation of indebtedness would generally be treated and taxed as ordinary income.  However, pursuant to 26 U.S.C. § 108 (Section 108 of the Internal Revenue Code), cancellation of indebtedness income is excluded from gross income that would otherwise be subject to taxation where it arises in connection with a discharge in a case under the Bankruptcy Code, including the discharge the Debtor will receive pursuant to § 1141 of the Bankruptcy Code.  The Debtor will be required to reduce certain tax attributes, including but not limited to (i) any net operating loss for the taxable year of the discharge, and any net operating loss carryover to such taxable year; and (ii) any net capital loss for the taxable year of the discharge.

**CIRCULAR 230 DISCLAIMER:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE INFORM YOU THAT (A) ANY U.S. FEDERAL TAX INFORMATION CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, FOR THE PURPOSE OF (1) AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, OR (2) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER RPARTY ANY TRANSACTION OR TAX MATTER(S) ADDRESSED HEREIN, AND (B) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE DEBTORS' SOLICITING ACCEPTANCE OF THE PLAN THROUGH THIS DISCLOSURE STATEMENT.**

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

## VI.  LIQUIDATION ANALYSIS

The Bankruptcy Code requires that a creditor with a right to vote either accept the Plan, or that such creditor receive under the Plan at least as much as it would receive if the case was converted to chapter 7, a trustee was appointed, the Debtors' operations were terminated, and the Debtors' assets were liquidated and the proceeds were distributed to creditors.  This is generally known as the "best interests" test.  In general, to apply the test the Debtors' assets would be valued at the estimated dollar amount that would be generated from their distressed liquidation in the context of a chapter 7 case by a trustee appointed by the Bankruptcy Court.  The analysis takes into account the costs and expenses of the liquidation, and such additional administrative and priority claims that may result from the termination of the Debtors' business and the use of chapter 7 for the purpose of liquidation.  Net liquidation proceeds would be paid to general unsecured creditors only to the extent funds are available after secured creditors have been paid the full value of their collateral and priority creditors receive full payment on their claims.

A September 2019 appraisal of the Debtors' assets by the James G. Murphy Company (the "Murphy Appraisal") yielded a Forced Liquidation Value of $362,375.  According the Murphy Appraisal, the Forced Liquidation Value is "the estimated most probably price expressed in terms of currency which could typically be realized at a properly advertised and conducted public auction, held under forced sale conditions and under present day economic trends, as of the effective date [September 4, 2019] of this appraisal report."  The Debtors believe that the process underlying the Forced Liquidation Value corresponds to how a trustee would proceed to liquidate the Debtors' assets if these cases were converted to chapter 7.

In addition, and as detailed above, the Debtors are participants in three multi-employer pension plans.  Each plan is underfunded and in "critical" status. If the Debtors ceased operations, as would occur if these cases were converted to chapter 7, the Debtors would be deemed to have effected a complete withdrawal from each pension plan, and pensions plans would have the right to file a claim for rejection damages under 11 U.S.C. § 365(g).  [There is no corresponding provision for the filing of rejection damages claim under chapter 11 and 11 U.S.C. § 1113.]  At that point, the Debtors would be assessed withdrawal liability by each pension plan, which generally is the employer's proportionate share of the plan's unfunded vested liabilities, as determined under a statutory formula.  Calculation of the actual amount of the withdrawal liability would be complicated and based on the Debtors' allocated share of the plan's unfunded vested benefits, which will depend on the date that the plan's assets and liabilities are valued, the actuarial assumptions and methods used to value the plan's assets and liabilities, and the allocation method chosen by the plan.[3]

For context, and as detailed above, the Carpenters Pension has made demand upon FVO for more than $1.2 million based upon FVO's alleged *partial* withdrawal from that pension fund.  A complete withdrawal would result in a higher dollar amount of liability, and the Debtors' complete withdrawal from the other pension plans would result in a significantly greater aggregate amount

---

[3] *See generally* *https://www.pbgc.gov/prac/multiemployer/withdrawal-liability,* last visited on February 24, 2020.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

owing. The amount of such withdrawal liability is wholly unknown at this time, but the Debtors presume that the amount would be at least in the range of $5-$10 million.

In this case, all the Debtors' assets are subject to liens and encumbrances securing the claims of Mountain Pacific Bank. Depending upon the amount of the Bank's claim when this hypothetical chapter 7 conversion occurred, there might be a small amount of unencumbered value in the Debtors' assets beyond that which would be necessary to pay the Bank's secured claim in full. There is potentially a small amount of value to be obtained from avoidance claims under chapter 5 of the Bankruptcy Code, but any recovery would be doubtful to the extent the claims were intercompany claims between the Debtors. Under the circumstances, there might be a small amount of value to distribute, but the Debtors' cash flow and its ability to make payments to creditors over time in the future would be lost.

Pursuant to priorities established under the Bankruptcy Code, any proceeds available after paying the secured claim of the Bank would be distributed, first, in payment of the trustee's commission, the fees and expenses of the trustee's attorneys, and other administrative expense claims in the chapter 7 case; second, to holders of any unpaid Administrative Expense Claims from the Debtors' chapter 11 cases; third, to holders of Priority Tax Claims from the Debtor's chapter 11 case; and, fourth, to holders of Unsecured Claims. After payment of all claims having senior priority, the Debtors do not believe that the chapter 7 trustee would make any distribution to unsecured creditors.

In contrast, the Plan provides for full payment of all Administrative Expense Claims, Priority Tax Claims and Allowed Claims in Classes 1, 3 and 4, and the maintenance of the Debtors' operations. The Plan plainly provides a much better alternative to creditors than a chapter 7 liquidation and the best interest test is therefore satisfied.

## VII. RISK FACTORS

The distributions to creditors contemplated under the Plan are contingent upon many assumptions, some or all of which could fail to materialize and preclude the Plan from becoming effective or reduce anticipated distributions. Those risks include the Debtor's ability to meet its projections and make the payments proposed under the Plan. Most important, however, is that the Plan is subject to approval by the various classes of creditors entitled to vote under the Bankruptcy Code and to confirmation of the Plan by the Bankruptcy Court. No assurance can be given that the Plan will be accepted by the requisite number and amount of creditors or confirmed by the Court. If the Plan is not confirmed for any reason, and given the costs and uncertainties inherent in a modified Plan of Reorganization or a conversion and liquidation under chapter 7, all creditors of the estate face substantial risk that their recovery under such alternative circumstances may be substantially less favorable than their recovery provided for by the Plan.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

# VIII.  CONFIRMATION OF THE PLAN

## A.      Voting Procedures

A ballot to be used for voting your acceptance or rejection of the Plan is being mailed to you together with this Disclosure Statement and Plan.  Holders of claims should read the instructions carefully, complete, date and sign the ballot, and transmit it in the envelope enclosed.  IN ORDER TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE INDICATED ADDRESS NOT LATER THAN _____.  FAILURE TO VOTE OR A VOTE TO REJECT THE PLAN WILL NOT AFFECT THE TREATMENT TO BE ACCORDED A CLAIM OR INTEREST IF THE PLAN NEVERTHELESS IS CONFIRMED.

If more than one-half in number of claimants voting and at least two-thirds in amount of the allowed claims of such claimants in each class of claims vote to accept the Plan, such classes will be deemed to have accepted the Plan.  If at least two-thirds in amount of the shares voted in a class of equity interests are voted to accept the Plan, such Class will be deemed to have accepted the Plan.  For purposes of determining whether a class of claims or interests has accepted or rejected the Plan, only the votes of those who have timely returned their ballots will be considered.

## B.      Hearing on Confirmation

The hearing on confirmation of the Plan has been set for _____ before the Honorable Marc L. Barreca, United States Bankruptcy Judge, in Courtroom 7106, United States Bankruptcy Court, 700 Stewart St., Seattle, WA  98101-1271.  The Bankruptcy Court shall confirm the Plan at that hearing only if certain requirements, as set forth in § 1129 of the Bankruptcy Code, are satisfied.

## C.      Best Interests of Creditors

In order to satisfy one of the requirements under § 1129, the Debtors must establish that with respect to each class, each holder of a claim in that class has accepted the Plan or will receive or retain under the Plan on account of such claim property of a value that is not less than the amount that such holder would receive if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.  As detailed in Section VI – Liquidation Analysis, it is clear that creditors will receive substantially more under the Plan than they would receive in a chapter 7 liquidation.

## D.      Feasibility

The Debtors must also establish that confirmation of the Plan is not likely to be followed by the Debtors' liquidation, or the need for further financial reorganization.  The Debtor will present evidence to support a finding that the Plan is feasible as necessary.

## E.      Treatment of Dissenting Classes of Creditors

The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc

impaired under, and has not accepted, the Plan. Upon such a finding, the Bankruptcy Court may confirm the Plan despite the objections of a dissenting class. The Debtor requests that the Court confirm the Plan even if creditors holding claims in impaired classes do not accept the Plan.

**F.     Effect of Confirmation**

After confirmation, all of the Reorganized Debtor's property shall be free and clear of all Claims of creditors except as otherwise provided in the Plan or the Confirmation Order. The provisions of the Plan shall bind the Debtor and all other parties in interest, including any creditor of the Debtor, whether or not such creditor is impaired by the Plan and whether or not such creditor has accepted the Plan.

Entry of a final order granting a discharge acts as a discharge of any and all liability of the Debtors that is dischargeable under Bankruptcy Code § 1141 and all creditors shall be subject to the discharge injunction provided in Bankruptcy Code § 542. To the extent provided by Bankruptcy Code § 1141, the rights afforded under the Plan and the treatment of Claims contained therein shall serve as complete satisfaction, discharge, and release of all Claims and liens of any nature.

**G.     Consequences of the Failure to Confirm the Plan**

In the event the Court declines to confirm the Debtors' Plan, a new plan may be negotiated and confirmed, or a liquidation might ultimately result, either through a revised Plan under chapter 11 or conversion of this chapter 11 case to a bankruptcy under chapter 7 of the Bankruptcy Code.

DATED this 24th day of February, 2020.

FISHING VESSEL OWNERS MARINE WAYS, INC.

By    /s/  *Dan Payne*
    Dan Payne
Its General Manager

SEATTLE MACHINE WORKS, INC.

By    /s/  *Dan Payne*
    Dan Payne
Its General Manager

DEBTORS' JOINT DISCLOSURE STATEMENT – Page 15

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

db24ke01bc